Filed 4/19/13  P. v. Gonzalez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ARNULFO GONZALEZ,<br><br>    Defendant and Appellant. | G045904<br><br>(Super. Ct. No. 10CF0597 )<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry J.T. Carlton and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found Arnulfo Gonzalez guilty of second degree murder for the unlawful killing of Samuel Valdivia (Pen. Code, § 187; all further references are to the Penal Code unless otherwise specified), and also found true he personally used a knife in the commission of the murder within the meaning of section 12022, subdivision (b), subsection (1). Gonzalez contends the trial court erred by providing an unmodified version of CALCRIM No. 625, which addresses the effect of voluntary intoxication in homicide crimes. Gonzalez argues the instruction could have caused a reasonable juror to disregard evidence of the victim's and witnesses' intoxicated state. For the reasons expressed below, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

In early March 2010, Gonzalez stayed with his friend Manuel Cervantes for 10 days while visiting Orange County to attend court hearings. On the afternoon of March 13, Gonzalez and Cervantes gathered at Samuel Valdivia's apartment. Joining them were Valdivia, Guillermo Macias, and Valdivia's nephew, Adan. The men drank beer and used methamphetamine in the days leading up to the homicide.

In the late afternoon, Gonzalez and Valdivia borrowed Cervantes's car to meet another friend for drinks. Cervantes, Macias, and Adan drove to Cervantes's sister's home, where they continued drinking and smoking methamphetamine. When Cervantes and Macias returned to Valdivia's apartment around 1:00 a.m., Gonzalez and Valdivia were arguing about whether Gonzalez had driven Cervantes's car recklessly. Gonzalez appeared upset and challenged Valdivia to fight. Valdivia declined and told Gonzalez to calm down. Gonzalez suggested they "get knives and fight," but Valdivia

2

refused Gonzalez's repeated challenges. When Gonzalez angrily struck Valdivia's furniture, Valdivia ordered Gonzalez to leave and pushed him out of the apartment.

Gonzalez left and moved his truck closer to Valdivia's apartment. He returned to the apartment five to 10 minutes later holding an open pocketknife. He repeatedly challenged Valdivia to come outside and fight. Valdivia initially refused, invited Gonzalez inside and urged him to forget about the argument. But Gonzalez continued to challenge Valdivia, who eventually relented and walked outside. The two men began fighting, and during the melee Gonzalez stabbed Valdivia seven times: once fatally under the armpit, which pierced Valdivia's lung and heart; twice in Valdivia's abdomen; and four times on Valdivia's left forearm.

Cervantes and Macias heard Valdivia exclaim, "he got me." They found Valdivia bleeding and still struggling with Gonzalez. Both men intervened to wrest the knife away from Gonzalez, who promptly fled the scene.

Around 3:00 p.m. that afternoon, police officers found Gonzalez driving his truck and pulled him over in a parking lot near the police station. Gonzalez admitted wounding Valdivia with the knife. Two hours later, authorities conducted a blood test on Gonzalez, which revealed the presence of methamphetamine.

The medical examiner testified the wounds on Valdivia's forearm were consistent with "defensive wounds" received when using the forearm to fend off blows. An autopsy revealed Valdivia's blood alcohol level was 0.26 and he had a low level of methamphetamine in his system.

At trial in August 2011, Gonzalez testified that at the time of the homicide he had not slept for four days, and he admitted he had been drinking alcohol and using methamphetamine with his friends. Gonzalez claimed Valdivia challenged him to fight

3

and pushed him out of the apartment. Gonzalez retrieved the pocketknife from his truck, but testified he did this to convince Valdivia to apologize for the argument, not to stab him. Gonzalez claimed he stabbed Validivia because he was frightened when Validivia, who was considerably taller and outweighed Gonzalez by 80 pounds, threatened and hit him.

Following the trial, a jury convicted Gonzalez of second degree murder and found he personally used a knife in the commission of the murder. The trial court sentenced Gonzalez to 16 years to life in prison.

II

DISCUSSION

A. *Trial Court Did Not Err By Providing an Unmodified Version of CALCRIM No. 625 (Voluntary Intoxication Effects on Homicide Crimes)*

Gonzalez contends the trial court's instruction on the effects of voluntary intoxication misled the jury by suggesting they could not weigh and consider evidence that Valdivia and the eyewitnesses were intoxicated. The trial court instructed the jury under Judicial Council of California Criminal Jury Instructions CALCRIM No. 625: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose. [¶] Voluntary intoxication is not relevant to the issue of 'implied malice.' If all the elements of

4

'implied malice' as I have defined them to you are established, the fact the defendant may have been voluntarily intoxicated is not a defense and does not negate the theory of implied malice."

Gonzalez argues "all of the percipient witnesses consumed drugs and alcohol in the hours before the altercation and . . . the victim [] had a blood alcohol level of [0.26] and had consumed methamphetamine. [¶] The witnesses, likely because of their level of intoxication, had difficulty recalling the details and provided inconsistent versions of the verbal and physical altercations. Moreover, the coroner testified that methamphetamine use can cause aggressive, bizarre, violent and unexpected behavior. According to the coroner, typically a person with a [0.26] blood alcohol level would have impaired judgement [*sic*] and motor skills. Moreover, the ability to move volitionally would be impaired, and a person may become clumsy, unable to judge distance, violent, and have difficulty controlling themselves. Appellant's defense at trial was that he was provoked by [the victim] and feared [him] because of his size and aggressive conduct and that he stabbed him in the heat of passion or in unreasonable self-defense."

Gonzalez asserts CALCRIM No. 625 misled the jury into believing "it was precluded from considering [Valdivia's] intoxication as relevant evidence negating the *mens rea* required from murder to manslaughter. A juror could also reasonably believe that he/she was also precluded from considering the witnesses' intoxication in evaluating their testimony and determining their ability to accurately observe, perceive, recall and recollect the incident."

We review CALCRIM No. 625 in light of the entirety of the instructions to determine whether there is a "reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) The trial

court in a criminal case must instruct sua sponte on "general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Anderson* (2011) 51 Cal.4th 989, 996–997 (*Anderson*).) The trial court's duty requires giving the jury instructions regarding the essential elements of a charged offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155.) It also extends to instructions on the defendant's theory of the case, including defenses the defendant relies on if there is substantial evidence to support the defense and it is not inconsistent with the defendant's theory. (*Anderson*, *supra*, at pp. 996–997.) But a party may not "'complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) If the court correctly instructs the jury on basic principles of law applicable to the charges, the burden is on the defendant to request a clarifying instruction. (*People v. Garvin* (2003) 110 Cal.App.4th 484, 488.)

The introductory sentence of the voluntary intoxication instruction explicitly directed the jury to consider "the *defendant*'s voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill [etc.]" (Italics added.) The instruction's later statement the jury "may not consider evidence of voluntary intoxication for any other purpose" must be considered in context, and therefore a reasonable juror would understand the statement refers to the *defendant's* voluntary intoxication.

That was clearly the way the parties construed the instruction in the lower court. The prosecutor argued the instruction applied to Gonzalez's voluntary intoxication, which he asserted was not "a defense to implied malice." During rebuttal

6

argument, the prosecutor noted, "The defense argues to you, well, if [Gonzalez] premeditated and deliberated, why would he telegraph that? Why wouldn't he just walk up and stab him? Well, he did have alcohol on board and he did have meth on board. We know that. Did that clear [*sic*] his judgment? Did it affect his judgment? Probably. Did it affect it to the point where he didn't form the intent to kill? Absolutely not. And even if did, you still have the implied malice murder."

Defense counsel's argument did not suggest the instruction applied to anyone other than Gonzalez. Counsel argued Gonzalez had used methamphetamine and "clearly was intoxicated at the time" of the crime, which "shows . . . he didn't intend to kill [Valdivia] and he didn't premeditate and deliberate . . . ." Defense counsel also elicited testimony concerning the victim's level of intoxication and the effect it would have on his conduct. Gonzalez testified he was afraid that Valdivia, 80 pounds heavier and eight inches taller, would hurt or even kill him. Defense counsel argued Gonzalez had testified "he was afraid he was going to be torn to pieces. He was going to be pummeled. This guy [Gonzalez] who's five-two, five-three, 115 pounds, versus a person [Valdivia] who's six feet tall and nearly 200 pounds. Who's been drinking all day, since at least three or four o'clock in the afternoon, until now, three o'clock in the morning. Who's smoked meth or ingested meth sometime or another during the day because his blood, as we stipulated to, is positive for methamphetamine. . . . [¶] That's the provocation that we're talking about that makes this not a murder." He also argued, "It's the fact that this drunk guy, this big, drunk, aggravated, aggressive guy came out the door and grabbed him. Shoved him out the door. Tried to hit him in the head. That's what heat of passion is." He made a similar argument concerning imperfect self-defense and self-defense theories.

7

Neither side suggested the instructions precluded consideration, as Gonzalez now contends, of Valdivia's intoxication as relevant to the victim's "conduct, attitude and demeanor." A reasonable juror would have understood CALCRIM No. 625 applied only to Gonzalez's voluntary intoxication and did not preclude consideration of Valdivia's intoxication as it may have related to provocation and Gonzalez's belief in the need to defend himself. The trial court directed the jury to consider the instructions as a whole, and provided comprehensive instructions addressing the elements of first and second degree murder and the state of mind required for murder (CALCRIM Nos. 520, 521, 560B), provocation and its effect on the degree of murder (CALCRIM No. 522), sudden quarrel and heat of passion manslaughter based on provocation (CALCRIM No. 570), imperfect self-defense (CALCRIM No. 571), self-defense (CALCRIM No. 505), and mutual combat (CALCRIM No. 3471).

The trial court also separately instructed the jury concerning evaluation of witness testimony. CALCRIM No. 226 provided in relevant part: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. [¶] You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe. [¶] In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony." The instruction included a nonexclusive list of considerations for evaluating credibility, including "How well could the witness see, hear, or otherwise perceive the things about which the witness testified?" (See also CALCRIM No. 105.)

8

Although neither the prosecution nor the defense emphasized intoxication evidence to attack credibility, neither side suggested the jury could not consider it, or that the evidence was irrelevant to an assessment of credibility. Defense counsel argued the methamphetamine found in Valdivia's blood suggested the witnesses were "not being honest" when they denied using drugs in Valdivia's presence, and they were trying to place Valdivia in the best light because of "the guilt they" felt about his death and "the things they didn't do in this case to help out their friend." CALCRIM No. 625, reasonably construed, did not prevent the jury from considering this argument, or from considering how alcohol and methamphetamine use affected the ability of witnesses to perceive or recollect.[1]

Because CALCRIM No. 625, reasonably construed, was not erroneous or ambiguous, we need not address whether Gonzalez forfeited his contentions, the error was prejudicial, or counsel acted ineffectively by failing to object or seek additional or clarifying language. Nor has Gonzalez shown how this instruction violated his federal constitutional rights to a fair trial or to present a defense.

---

[1] The jury made one request during deliberations: "The definition of the following: 1) Lawful justification (murder) [¶] 2) Provocation (manslaughter) [¶] 3) Conscious disregard (implied malice)." The court responded, "These are words and phrases that have no special meanings beyond what is included in the instructions you have been given." Nothing suggests any jury confusion about the use of the intoxication evidence.

9

## III

### DISPOSITION

The judgment is affirmed.


ARONSON, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.